**MAKOWSKI v. UNITED STATES.**
Civ. A. No. 3013.

United States District Court
M. D. Pennsylvania.
June 11, 1952.

576

John W. Bour, James J. Powell, Scranton, Pa., for plaintiff.

Arthur A. Maguire, U. S. Atty., Joseph P. Brennan, Scranton, Pa., Asst. U. S. Atty., for defendant.

WATSON, Chief Judge.

This is an action by the beneficiary of a life insurance policy issued by the Government under the National Service Life Insurance Act of 1940, as amended, 38 U.S. C.A. § 801 et seq. The only issue in the case was whether or not the insured was permanently and totally disabled for purpose of waiver of premiums. The case was tried twice; in the first trial the jury disagreed; in the second trial the jury found for the plaintiff. At the second trial, defendant filed a motion to dismiss at the close of plaintiff's case, and a motion for a directed verdict at the close of defendant's case, both of which motions were

denied. Defendant now moves to set aside the verdict and enter judgment for defendant on the ground that there was no proof that the insured was totally disabled under the provisions of the National Service Life Insurance Act, and in the alternative for a new trial on the ground that the verdict is against the weight of the evidence.

■ Many of the facts and the issue in the case were stipulated by the parties. Evidence as to other facts was introduced at the trial of the case by way of lay and expert witnesses and also by exhibits, all of which the Court must view in a light most favorable to the plaintiff, including every reasonable inference fairly deducible therefrom. Masterson v. Pennsylvania R. Co., 3 Cir., 1950, 182 F.2d 793; United States v. Calvey, 3 Cir., 1940, 110 F.2d 327.

The defendant admits that the insured was permanently and totally disabled from January 11, 1944, which was approximately five months prior to his discharge from the Army, to July 27, 1944, when the insured secured a job with the Murray Corporation of America as a General Production Assembler. The insured worked at this job until March 31, 1945. The defendant admits that the insured was once again permanently and totally disabled from March 31, 1945, when he quit the job, until the insured committed suicide on May 21, 1946. The government contends that, during the eight months interim when insured was employed, the insured's work record was such as to conclusively negative a finding that plaintiff was permanently and totally disabled. It is therefore necessary to determine whether there was sufficient evidence to submit the case to the jury, and further whether the evidence was sufficient to support the jury's verdict that the insured was permanently and totally disabled for the period during which the insured was employed.

When the insured went to the Murray Plant for employment he was given a personality test, an intelligence test and a mechanical aptitude test. Having received a favorable score in these tests, he was given a final interview with Mr. Davis, one of the final interviewers of hourly personnel, which interview took a maximum of 10 minutes. Mr. Davis said he appeared to be a normal, healthy, young man. He was then sent to a medical examiner, Dr. Kempter, for a physical examination, which took about 20 minutes. Dr. Kempter diagnosed the insured as being a psychoneurotic and gave the insured an X–3 classification, which was next to the lowest of four classifications (X–1 to X–4) given at the Murray Plant. Had the insured received the lowest classification, X–4, he would not have been hired. Dr. Kempter testified that he did not believe that the insured was suffering from dementia praecox at the time he examined him, because he would have referred him to a psychiatrist had he thought so.

The insured was first assigned to the training school for assemblers, where he spent two weeks and received 70¢ an hour. He was then assigned to the assembly line where his duties were to drill holes in airplane wings and to buck rivets; he now received 80¢ an hour. The insured was employed for a period of approximately eight months, during which time he earned $1367.25. He was absent from work for about three weeks in December, 1944 and January, 1945, during which period the Murray Plant received a medical report from the insured's family physician, dated December 28, 1944. Some of the remarks appearing on the physician's report were as follows:

"Symptoms: Extreme nervousness, trembling, sits and looks into space; will not answer questions readily. Loss of appetite."

"Your exact diagnosis: Psychoneurosis; Malaria."

At the trial the family physician stated his diagnosis as to malaria was incorrect.

Henry Butcher was the insured's group leader during his employment period, and testified that the insured would not do his work when instructed to do so, he would do the work improperly, stray from his work, eat lunch by himself under one of the assembly jigs and talk and laugh to himself. He reported these matters to his superiors and made a request for insured's transfer as he felt the insured was a bad influence

on the job. Butcher did not request this transfer in writing as required by plant procedure.

The Murray Company personnel records, which were offered in evidence by the defendant, corroborated to some extent the testimony given by Butcher, the group leader. What is apparently a report made by Butcher reads as follows:

"Couldn't seem to stay at his work. Would go and lay down. Would fall asleep. Memory very bad. Very afraid of bosses. Stuttering quite a bit. Lost time. Came back and went off on H. C. again. When lunch time came he would go off by himself and usually come back later."

This same report bears another notation, apparently made by a William Bowman, which reads as follows:

"Odd—Talked to self. Used to walk away from job. Very foggy. Funny smile on his face."

It was the procedure in the Murray Plant to increase a worker's pay after a certain period of time, provided the group leader and supervisor indicated their approval. In an effort to show that the insured was performing his work satisfactorily, the government showed that the insured's hourly rate of pay was increased from 80¢ to 85¢ in September, 1944, and from 85¢ to 90¢ in December, 1944.

Anna Makowski, a sister of the insured, testified that while the insured was employed at the Murray Plant, he was very nervous, did not talk to anybody, chased her girl friend out of the house, painted his head with iodine, he was dirty, and burned the sofa and pillow with a cigarette and made no effort to extinguish the fire.

Jeane Tono, a frequent visitor at the Makowski home in the summer of 1944, but who was only 10 years of age at the time of the visits, testified that on a hot night the insured had a heating stove in the dining room red hot, and was standing by it with his hands and face painted with

iodine and his hair shaved off his head. The insured told her to leave the room and go out on the porch. On other occasions, if the insured was eating when she walked in, he would take his plate and go into another room.

Dr. Gombar, the family physician, who examined the insured a number of times during the period of his employment at the Murray Plant, testified that although he did not make a definite diagnosis of dementia praecox until April, 1945, nevertheless, it was his opinion that the insured was suffering from dementia praecox from the time he left the Army until he died.

Dr. Lamberti, a psychiatrist, did not examine the insured, but offered expert testimony to the effect that dementia praecox could not be cured without psychiatric treatment, and that in his opinion the insured's employment at the Murray Plant aggravated his condition. There was no evidence that the insured ever received any psychiatric treatment.

The only medical testimony offered by the defendant was that of Dr. Kempter, who examined the insured when he sought employment at the Murray Plant. He diagnosed the insured's condition as psychoneurosis and said he would have rejected the insured if he felt that the insured were insane.

Permanent and total disability within the meaning of the National Service Life Insurance Act is defined in a regulation promulgated by the Veterans' Administration, appearing in 38 C.F.R. 8:43. It reads:

"Total disability as referred to herein is any impairment of mind or body which continuously renders it impossible for the insured to follow any substantially gainful occupation."

For all practical purposes this is the same definition which was used in the War Risk Insurance policies of World War I,[1] and, therefore, cases decided under the War Risk Insurance Act will also be helpful in this case.

1. Under the War Risk Insurance Act, total disability was defined as, "Any impairment of mind or body which renders it impossible for the disabled person to follow continuously any substantially gainful occupation * * *."

In determining whether or not a person is totally disabled under War Risk Insurance and National Service Life Insurance, the test is not whether an insured worked but whether he was able to work. McHam v. United States, D.C.W.D.S.C., 1949, 87 F.Supp. 84, and cases cited therein. The mere fact that a claimant may have worked for substantial periods during the time when he claims to have been permanently and totally disabled is not conclusive against him. The question is not whether he worked, but whether he was able to work, i. e., whether he was able to follow continuously some substantially gainful occupation without material injury to his health. Of course, the fact that a man does work is evidence to be considered by the jury as tending to negative the claim of disability; but the fact that he works when physically unable to do so ought not to defeat his right to recover if the jury finds that such disability in fact existed. Carter v. United States, 4 Cir., 1931, 49 F.2d 221, 223.

In Berry v. United States, 1941, 312 U.S. 450, 61 S.Ct. 637, 639, 85 L.Ed. 945, a decision adverse to the claimant was reversed by the Supreme Court because the evidence as a whole would justify the jury in finding that since his injuries, he never had been, and would not thereafter be, able to work with any reasonable degree of regularity at any substantially gainful employment, despite the fact that he did do some work. The Court stated, "It was not necessary that petitioner be bed-ridden, wholly helpless, or that he should abandon every possible effort to work in order for the jury to find that he was totally and permanently disabled."

In Hoisington v. United States, 2 Cir., 1942, 127 F.2d 476, 477, the claimant was suffering from a nervous neurasthenic condition, but had worked for 36 consecutive two-week periods and after a five-month layoff was re-employed at increased wages, and worked consecutively for 22 two-week periods, in more than half of which he worked full time and in none of which did he lose more than two days. The Court stated, "Such extended periods of continuous labor after the critical date tend to support the appellant's contention that as a matter of law the insured was not totally disabled before May 31, 1919. Some years ago this court would quite likely have so ruled. In United States v. McDevitt, 2 Cir., 90 F.2d 592, at page 595, we said that 'A man who can hold jobs for ten and sixteen months at a stretch, is not "totally disabled," even though he must give up for a season and seek work anew'. But recent decisions of the Supreme Court indicate very clearly that the issue of total permanent disability should be left for decision by the jury under proper instructions, rather than determined by the judges. Berry v. United States, 312 U.S. 450, 61 S.Ct. 637, 85 L.Ed. 945; Halliday v. United States, 1942, 315 U.S. 94, 62 S.Ct. 438, 86 L.Ed. 711 * * *."

In Tieben v. United States, 7 Cir., 1938, 96 F.2d 907, the insured sought to recover total and permanent disability benefits under a War Risk Insurance policy, and the ailment or disease relied upon was mental and described as dementia praecox. He was employed by the Ford Motor Co. for a five-month period, another period of twenty-three months, and also by International Motor Co. for over two months, although the insured did have difficulty in performing his duties and his work irregular. The Court held that the issue of insured's disability was properly submitted to the jury and there was substantial evidence to support the jury's verdict in favor of the plaintiff.

In McHam v. United States, 87 F.Supp. 84, supra, the insured worked as a baker more or less regularly for eighteen months after he had stopped paying premiums The case was tried by the court without a jury, and the Court found that though the insured worked, he did so to the detriment of his health and that he was totally disabled for purpose of waiver of premiums.

In applying the test of permanent and total disability, as announced in the cases referred to above, to the facts of the instant case, the Court believes that the question of the extent and permanency of the insured's disability was properly left to the jury, and, further, that there was evidence from which the jury could reach

580

the conclusion that the insured was permanently and totally disabled for purpose of waiver of premiums, even though he did work for a substantial period of time. Although there was evidence from which a jury could have reached a contrary conclusion, the Court cannot say that the jury's verdict was against the weight of the evidence, so as to permit the Court to set aside the verdict and enter judgment for the defendant, or grant the defendant a new trial.

In its motion for new trial the defendant also contended that the testimony of Henry Butcher was inadmissible, and that Dr. Gombar's testimony as to the mental condition of the insured was also inadmissible. Defendant did not press these grounds at the argument, but the Court, nevertheless, has examined the testimony and feels that it was properly admitted.

An appropriate order denying defendant's motion to set aside the verdict and enter judgment for defendant, and also defendant's motion for a new trial will be filed herewith.

### Order

Now, it is ordered that defendant's motion to set aside the verdict and enter judgment for the defendant, and defendant's motion for new trial, be, and they hereby are, denied.